J-A26026-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| C.M.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| D.R.M., | |
| Appellee | No. 544 MDA 2014 |

Appeal from the Order entered February 28, 2014,
in the Court of Common Pleas of Franklin County,
Civil Division, at No(s): FR 2011-579

BEFORE:  BOWES, MUNDY, and JENKINS, JJ.

MEMORANDUM BY MUNDY, J.:                    **FILED JANUARY 23, 2015**

Appellant, C.M.M. (Mother) appeals from the February 28, 2014 order granting the petition for modification of the existing custody order filed by Appellee, D.R.M. (Father).  Upon careful review, we affirm.

In its opinion accompanying the subject order, the trial court aptly set forth the facts in this case, which we adopt herein.  **See** Trial Court Opinion, 2/28/14, at 1-2.[1]  We summarize the factual and procedural history relevant to this disposition as follows.  Mother and Father have three children born from their marriage, a son, L.L.M., born in March 2004, and two daughters, B.M.M., born in May 2005, and J.R.M., born in July 2006 (collectively, the

---

[1] We note that on April 15, 2014, the trial court subsequently filed an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).  In said opinion, the trial court adopted its February 28, 2014 opinion, and attached it for reference.  In its 1925(a) opinion the trial court addressed Mother's specific issues raised on appeal.

Children).  The parties separated in January of 2011.[2]  By an agreed-upon order dated April 28, 2011, the parties were granted shared legal custody. The custody order granted primary physical custody to Mother, and granted Father partial physical custody every Wednesday and Thursday from 9:00 a.m. until 7:00 p.m. each day, and on alternating consecutive Fridays, Saturdays, and Sundays, from 9:00 a.m. until 7:00 p.m. each day.

On July 30, 2013, Father filed a *pro se* petition for modification of the existing custody order.  Following a custody conciliation conference, on October 4, 2013, the trial court modified the existing custody schedule by order, granting Saturday overnights to Father during his alternating custodial weekends.  On October 11, 2013, Father filed a motion for a pre-trial conference.  The trial court scheduled the pre-trial conference for December 4, 2013, and directed the parties to submit a pre-trial conference memorandum at least five days prior to the pre-trial conference.  Trial Court Order, 10/23/13.  Father and Mother filed their pre-trial conference memoranda on November 25, 2013, and December 2, 2013, respectively. By order dated December 5, 2013, the court scheduled the custody trial for February 17, 2014.  Thereafter, on January 3, 2014, Mother filed an amended request for relief wherein she requested that Father be granted supervised partial physical custody.

---

[2] At the time of the subject proceeding, the parties' divorce remained pending.  N.T., 2/17/14, at 5.

In addition to Mother and Father, the trial court heard testimony from eleven witnesses during the custody trial. The testimonial evidence revealed that Mother and Father live one mile apart, and the Children's school is located between the parties' homes. N.T., 2/17/14, at 25. Mother resides with her paramour, R.K.,[3] whose five-year-old daughter stays with them on Sundays and Mondays. *Id.* at 62. Father resides with his paramour, E.D., who does not have any children. The trial court interviewed the Children *in camera* separately, who were then ages nine, eight, and seven. Each of the Children testified that they would like to spend overnights with Father on his custodial days. *Id.* at 243-244, 255-256, 268.

On February 28, 2014, the trial court granted the parties shared legal and physical custody according to the following arrangement. Mother shall have the Children every Monday at 9:00 a.m. through Wednesday at 9:00 a.m. and every other weekend from Friday at 9:00 a.m., through Monday at 9:00 a.m. Father shall have the Children every Wednesday at 9:00 a.m. through Friday at 9:00 a.m. and every other weekend from Friday at 9:00 a.m., through Monday at 9:00 a.m. The trial court also set forth a holiday custody schedule.

On March 26, 2014, Mother filed a notice of appeal. The following day, on March 27, 2014, the trial court directed Mother to file, within ten days, a concise statement of errors complained of on appeal pursuant to Pa.R.A.P.

---

[3] R.K. is referred to in the notes of testimony as "RJ," the name he uses. N.T., 2/17/14, at 74, 118.

1925(a)(2)(i) and (b). Mother filed the concise statement the same date. Because Mother timely complied with the court order, we will review her issues on appeal. *Cf. J.P. v. S.P.*, 991 A.2d 904, 908 (Pa. Super. 2010) (stating that, where the appellant not only failed to simultaneously file a concise statement with her notice of appeal, but also failed to comply with the trial court's order to file a concise statement within 21 days, she waived her issues on appeal). On April 15, 2014, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Mother presents the following issues for our review.

> 1. Did the [trial c]ourt fail to follow the "best-interests of the child[ren]" doctrine, and ignore the recognition that "the removal of children from their environment is a factor which bears on their emotional well-being" when the prevailing Order was long-standing and unquestionably successful?
>
> 2. Did the [trial c]ourt's opinion improperly criticize [Mother] for having long work hours which cause her to be away from her children, while the [trial c]ourt failed to recognize that this issue is a direct result of [Father]'s unwillingness to work to his capabilities, and that Father also has a work schedule that is less than ideal, which he has the ability to change but chooses not to? Did not the [trial c]ourt's Order also fail to place the children with an available parent, despite the fact that the [trial c]ourt claims it does?
>
> 3. Did the [trial c]ourt fail to give proper consideration to [Father]'s sexual deviancy, and inability to provide the [C]hildren with the protection they deserve and, to the contrary award [Father] more time with the [C]hildren instead of supervising his unfettered access to three vulnerable minors?

4. Did the [trial c]ourt err by ignoring undisputed evidence presented as to [Father]'s real demeanor, where the [trial c]ourt heard four recordings in which [Father] engaged in a profanity laden tirade against the [Children's maternal grandmother]? Did the [trial c]ourt fail to properly consider the effect on the [C]hildren placing them in a home with a person who obviously suffers from mood disorders, anger issues and the inability to handle matters that concern him in an appropriate manner?

5. Did the [trial c]ourt wrongfully prohibit [Mother] from bringing into evidence, the testimony that would have shown that [Father] has been seen in possession of alcohol while with the [C]hildren, especially since same is an enumerated factor pursuant to 23 Pa.C.S. [§] 5328?

Mother's Brief at 5-6.[4]

The scope and standard of review in custody matters is as follows.

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.
>
> **R.M.G., Jr. v. F.M.G.**, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting **Bovard v. Baker**, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

---

[4] We have re-ordered Mother's issues for ease of disposition.

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.
>
> **R.M.G., Jr.**, **supra** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. **Ketterer v. Seifert**, 902 A.2d 533, 539 (Pa. Super. 2006).

**A.V. v. S.T.**, 87 A.3d 818, 820 (Pa. Super. 2014).

The primary concern in any custody case is the best interests of the child. **Id.** "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." **Saintz v. Rinker**, 902 A.2d 509, 512 (Pa. Super. 2006), *quoting* **Arnold v. Arnold**, 847 A.2d 674, 677 (Pa. Super. 2004).

Because the hearing in this matter was held on February 17, 2014, the Child Custody Act (Act), 23 Pa.C.S. §§ 5321-5340, is applicable. **See C.R.F. v. S.E.F.**, 45 A.3d 441, 445 (Pa. Super. 2012) (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply). Section 5328 of the

Act sets forth certain factors a trial court must consider in order to determine the best interest of the child when awarding custody. Specifically, Section 5328 provides as follows.

> **§ 5328. Factors to consider when awarding custody**
>
> **(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
>> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>>
>> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>>
>> (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).
>>
>> (3) The parental duties performed by each party on behalf of the child.
>>
>> (4) The need for stability and continuity in the child's education, family life and community life.
>>
>> (5) The availability of extended family.
>>
>> (6) The child's sibling relationships.
>>
>> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a)(1)-(16).

This Court has stated that, "[**a**]ll of the factors listed in section 5328(a) are required to be considered by the trial court when entering a

J-A26026-14

custody order." ***J.R.M. v. J.E.A.****,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original).

> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." ***C.B. v. J.B.****,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013).

***A.V.****,* ***supra*** at 822-823. Instantly, the trial court set forth a detailed and comprehensive analysis of each custody factor of Section 5328(a) in its February 28, 2014 opinion accompanying the subject order, which we have carefully reviewed in light of Mother's issues on appeal. ***See*** Trial Court Opinion, 2/28/14, at 3-11.

In her first issue, Mother argues the evidence does not support the custody order because she has been the Children's primary caretaker since the parties' separation in January of 2011, and the Children are thriving. Mother's Brief at 9-10. As such, Mother contends that the shared physical custody arrangement poses a detriment to the Children's emotional well-being.

In its Rule 1925(a) opinion, the trial court rejected Mother's argument by stating that the Children "spent a significant amount of time (other than overnights) in Father's custody." Trial Court Opinion, 4/15/14, at 6. The trial court further reasoned as follows.

> The evidence suggested that Father was an active participant in all aspects of the [C]hildren's lives. In addition, because of Mother's work schedule, the [C]hildren spent a considerable amount of time with caregivers other than Mother. Because the [C]hildren were used to spending significant periods of time in their father's custody, as well as with other caregivers, it is difficult to see how the Court's decision disrupts the status quo to the [C]hildren's detriment.

*Id.* Upon review, we discern no abuse of discretion by the trial court.

Since April of 2011, Father has exercised partial custody every Wednesday and Thursday from 9:00 a.m. until 7:00 p.m. both days, and on alternating consecutive Fridays, Saturdays, and Sundays, from 9:00 a.m. until 7:00 p.m. each day. Thus, although the Children did not spend overnights with Father until October of 2013, the record evidence supports the trial court's finding that the Children are used to spending a significant amount of time with him.

Further, the record supports the trial court's finding that Father is an active participant in all aspects of the Children's lives. Father testified he has been very involved with the Children's school experience, including accompanying them on field trips and volunteering in different capacities at their school. N.T., 2/17/14, at 9-10. In fact, Father testified he currently is the vice-president of the Parent Teacher Organization (PTO). *Id.* at 9. Father testified he assists the Children with their homework during his custodial time. *Id.* at 10-11. Additionally, Father testified that L.L.M. and

B.M.M. participate on a swim team, and he attends 90 percent of their swim meets. *Id.* at 12-13.

The testimonial evidence also supports the trial court's finding that the Children spend a significant amount of time with caregivers due to Mother's work schedule. Mother testified she is employed as a senior manager with Outback Steak House in Hagerstown, Maryland, and she works 55 hours per week. *Id.* at 62, 71, 106. Mother testified that, on Wednesday through Friday, she reports to work anytime from 1:00 p.m. to 3:00 p.m., and she is there until "either 10:00 p.m. or about 1:00 a.m." *Id.* at 73. On the weekends that the Children are in her custody, Mother testified she reports for work at 3:00 p.m. and arrives home "around 1:00 or 2:00 a.m." *Id.* Mother has off from work on Mondays and Tuesdays. *Id.* at 78-79. Mother testified she takes the Children to school every day. *Id.* at 78. With respect to the afternoons when Mother is at work, the Children are either in Father's custody after school until 7:00 p.m., when they return to Mother's home, and her paramour, R.K., puts them to bed, or, on alternating Fridays, they return to Mother's home where R.K. meets their needs. *Id.* at 79-80. In addition, Mother testified that, for childcare, she relies mostly on her sister-in-law, the mother of her sister-in-law, and her nieces. *Id.* at 81-82.

R.K. testified that he is an assistant manager at Game Stop and that he works Tuesdays through Saturdays from 9:00 a.m. to 5:00 p.m. *Id.* at 118-119. R.K. testified that when both he and Mother are working, "we

have one of the [Children's] cousins[5] come over and babysit...." *Id.* at 125.
Based on the foregoing, we conclude that the trial court's factual findings
support its conclusion that a shared physical custody award will not pose a
detriment to the Children's best interests because the Children spend a
significant amount of time with caregivers when they are not with Father.
As such, Mother's first issue fails.

Mother argues in her second issue that the trial court erred to the
extent it based its custody decision on attempting to place the Children with
Father when Mother is at work. Mother's Brief at 17. Specifically, Mother
asserts that, under the subject order, the Children will spend time in the
care solely of E.D., Father's paramour, due to his work schedule, and that
the trial court should have tailored a partial custody award for Father that
considered his work schedule. *Id.* Further, Mother asserts the trial court
erred to the extent it fashioned a custody order that penalized her for her
work schedule. *Id.*

The trial court responded to Mother's assertions in its Rule 1925(a)
opinion, in part, as follows.

> This Court did consider Mother's employment as it
> related to the stability of the [C]hildren. When the
> [C]hildren were interviewed *in camera*, they all
> expressed their desire to spend more time with their
> father. The [C]hildren also expressed their sadness
> that Mother was not able to be home with them
> more because of her work commitments. The Court

---

[5] The Children's cousins who provide childcare are A.J. and T.J., who are
Mother's nieces.

sought, not to punish Mother for her long work hours and dedication to her employer and her family's financial stability, but to place the [C]hildren with an available parent when Mother must be at work, rather than with other caregivers.

Trial Court Opinion, 4/15/14, at 11. We discern no abuse of discretion by the trial court.

Father testified he works 30 to 36 hours per week at a liquor store, Village Spirits, which is ten minutes from his home. N.T., 2/17/14, at 11-12, 47. On cross-examination, Father testified he works on Tuesdays and Thursdays and that he leaves for work at 3:45 p.m., and he returns home at 10:00 p.m. *Id.* at 52-53. Father also testified he works in the evenings on Saturdays and Sundays. *Id.* at 51. However, Father testified that his "schedule sort of revolves around the kids, you know, if I need a day off I take a day off. If I need to go on a [school] field trip, I take time to go on [a] field trip. If I need to be at a swim meet, I take time off for the swim meet." *Id.* at 12. With respect to E.D., Father's paramour, she testified she works at the YMCA in the before and after school program. *Id.* at 135. E.D.'s job at the YMCA also includes assisting with the swim meets and swim practices participated in by L.M.M. and B.M.M. *Id.* Father testified he would not need childcare based on his and E.D.'s work schedules. *Id.* at 23.

During his *in camera* interview, L.L.M., then age nine, testified that R.K., Mother's paramour, "is not [home] a lot either, so, we're usually babysat" when Mother is at work. *Id.* at 238. L.L.M. testified they are

babysat by "[a]nybody who's really available, I mean, babys[a]t by our cousins, or R.[K.]'s sister." **Id.** He continued upon inquiry by the trial court:

> Q. [D]oes that worry you, that you have babysitters in the house?
>
> A. Sort of, yeah.
>
> Q. Why is that?
>
> A. Because I don't see why I would have to be there when I could have been spending time with either my step-mom or my dad at my father's house.

**Id.**

B.M.M., then age eight, testified during her *in camera* interview as follows.

> Q. [W]hen you're at your dad's house, do you get to spend time with him?
>
> A. Yeah, much more than we do with our mother.
>
> Q. [ ] Because your mom's working?
>
> A. We're a lot – we only get – we hardly get on Sundays with her, and then we get Monday and Tuesday, and then with our father we get like half of the day of every day we're there with him.

**Id.** at 254-255.

J.R.M., then age seven, testified during her *in camera* interview that, "I trust my dad more than my mom." **Id.** at 269. She explained as follows.

> Q. Why is that?

-14-

A. Well, it's not really a reason, just I trust my dad more than mom.

Q. You trust him when it comes to what?

A. Pretty much everything.

Q. Really?

A. (Nods head affirmatively).

Q. Like telling him something that's bothering you?

A. (Nods head affirmatively).

Q. Is that a yes?

A. Uh huh (Affirmative response).

Q. You would tell your dad before you'd tell your mom?

A. Yeah.

Q. But why?

A. Well, sometimes I don't really have time to tell my mom, so I kind of have to tell my dad first.

Q. Because of her working, you mean?

A. Yeah.

*Id.* at 269-270. Significantly, the Children testified that they would like to spend overnights with Father on his custodial days. *Id.* at 243-244, 255-256, 268.

Based on the foregoing testimonial evidence, we discern no error of law or abuse of discretion by the trial court in fashioning a custody order based, in part, on Mother's work schedule. Further, contrary to Mother's

assertion, we discern no punitive motive by the trial court. Rather, we conclude the trial court properly fashioned a custody order based on the totality of the evidence, including, but not limited to, the Children's testimony that they feel the absence of Mother when she is at work, and that they see Father more than Mother during the parties' respective custody times. Moreover, we will not disturb the order to the extent E.D. will provide care to the Children when Father is at work. Mother's argument in this respect is speculative, as the record is not clear regarding Father's work schedule. In fact, the testimonial evidence indicates that Father's work schedule is flexible and that he has changed it in the past to accommodate the Children. N.T., 2/17/14, at 12, 134. As such, we conclude the trial court's consideration of Mother's work schedule was proper, and its custody decision reasonable. Therefore, Mother's second issue fails.

In her third issue, Mother argues the trial court failed to properly consider Father's alleged sexual deviancy as testified to during the custody trial by Mother's sixteen-year-old niece, A.J., and eighteen-year-old niece T.J., the daughters of Mother's brother. Mother's Brief at 11-12. The trial court accurately set forth the testimony of A.J. and T.J. in its opinion accompanying the subject order, which we adopt herein. *See* Trial Court Opinion, 2/28/14, at 4. Further, the trial court accurately stated that Father specifically denied the allegations of A.J. and T.J. and that he denied knowing of the allegations at any time prior to Mother raising them in her

J-A26026-14

pre-trial conference memorandum filed on December 2, 2013.[6]  ***Id.*** at 5;

***see also*** N.T., 2/17/14, at 215-219.

The trial court concluded in its opinion that accompanied the subject

order as follows.

> While the [trial c]ourt certainly cannot ignore the allegations of A.J. and T.J., the [trial c]ourt is very concerned that no adult felt it appropriate to raise the allegations of Father's alleged inappropriate behavior prior to the December 2013 Pre-Trial Conference Memorandum.  Many opportunities to address the allegations, discover the truth, and respond accordingly were missed….  Only after Father requested additional time with the [C]hildren by moving this case to pre-trial conference did Mother engage in the investigation reported to the [trial c]ourt at trial.  In addition, there is no evidence that the [C]hildren …  have ever been subjected to inappropriate touching or other inappropriate conduct by Father.
>
> The state of the record leaves the [trial c]ourt with far more questions than answers.  When balanced with the other credible evidence in the case, the [trial c]ourt is constrained to find that A.J.'s and T.J.'s allegations, without more, are insufficient to warrant either reducing Father's time with the [C]hildren or requiring that his time be supervised.

---

[6] In her pre-trial conference memorandum, Mother alleged deviant sexual behavior by Father against teenage girls.  Mother's Pre-Trial Memorandum, 12/2/13.  In addition, Mother alleged that Father has made his minor daughters, B.M.M. and J.R.M., eat dinner topless.  ***Id.***  The trial court found that Father and E.D. have made the Children eat "messy spaghetti dinners" without their shirts, on occasion.  Trial Court Opinion, 2/28/14, at 11 n. 2. The court concluded that this decision by Father is not inappropriate, but cautioned that "as the children age and become more aware of their developing bodies, Father is again, strenuously encouraged to find another way to resolve this issue."  ***Id.***  Upon review, the record supports the court's conclusion.

-17-

J-A26026-14

Trial Court Opinion, 2/28/14, at 11-12 (footnote omitted).

Further, the trial court explained in its Rule 1925(a) opinion.

> Mother and her sister[-in-law], E.J., both testified that they were aware of A.J.'s allegations at the time the incidents were alleged to have occurred 4 ½ years ago. According to Mother, Father was confronted and denied the allegations. At trial, Father denied the allegations and further denied even being confronted 4 ½ years ago by Mother or E.J. Nothing further was done to protect A.J., her sister[,] T.J., or the [C]hildren from Father such as prohibiting contact, requiring counseling, or initiating a report to police or child protective services. Further, A.J. testified that she was told by her mother that if she continued her allegations she was going to Brook Lane (a mental health facility) – testimony th[e trial c]ourt interpreted as evidence that A.J.'s own mother (E.J.) did not believe her daughter at the time she first made these allegations against Father. A.J. also explained that at the time, she was known for "making things up."

Trial Court Opinion, 4/15/14, at 7. The trial court stated that the Children's safety is of paramount concern. *Id.* at 8. However, it concluded, "to deprive the [C]hildren of their relationship with Father on evidence the [trial c]ourt did not find sufficiently persuasive, is not in the [C]hildren's best interest." *Id.*

Upon careful review, we hold that the totality of the record evidence supports the trial court's conclusions. In so holding, we give deference to the trial court on its determinations regarding credibility and weight of the evidence with respect to the allegations of sexual deviancy made against Father. *See A.V., supra* at 820. Accordingly, Mother's third issue fails.

- 18 -

In her fourth issue, Mother argues the trial court erred with respect to the weight it placed on four separate voice mail recordings Father left on the answering machine of the Children's maternal grandmother on February 22, 2011. Mother's Brief at 14-15. There is no dispute that the recordings "consisted of several minutes of a profanity-laden tirade directed at" the Children's maternal grandmother. Trial Court Opinion, 4/15/14, at 8 n.2. Mother asserts that "[i]t is clear from said messages that Father has a very short fuse, is full of anger, and has no ability to temper his behavior." Mother's Brief at 15. Mother argues Father engaging "in reprehensible behavior on one occasion should cause fear of repetitive behavior, especially where young, defenseless children are involved." *Id.* As such, Mother contends that the trial court erred in failing to order that Father participate in a mental health evaluation and attend anger management classes before modifying the custody order.

The trial court placed little weight on Father's voice mail messages, admitted as evidence during the custody trial. N.T., 2/17/14, at 193-198, 227. The trial court found that, "[a]side from the recordings all left on the same day, the Court heard no evidence to support Mother's allegations that Father" suffers from anger issues. Trial Court Opinion, 4/15/14, at 8 (footnote omitted). The trial court explained as follows.

> Clearly, on the date and time in February, 2011, that the messages were left, Father was irate with Maternal Grandmother and chose to express his anger by verbally assaulting her on her answering

machine. While the [trial c]ourt cannot sanction such inappropriate behavior, the [trial c]ourt cannot assume that because Father engaged in this inappropriate behavior on one day three years ago just after the break-up of the parties' marriage, that he currently suffers from mood disorders, anger issues, and the inability to handle matters that concern him in an appropriate manner, or even more importantly, that he will treat his children in a similar manner either at present or in the future. There was no evidence to suggest that Father's behavior was a pattern or that Father has ever or will in the future engage the [C]hildren in similar scenarios.

*Id.* at 9 (footnote omitted). Upon careful review, we hold the trial court's conclusion is reasonable in light of the record evidence. Additionally, we defer to the trial court with respect to its determination on the weight of the evidence in this regard. ***See A.V.***, ***supra*** at 820. Therefore, Mother's fourth issue fails.

In her final issue, Mother argues the court erred in prohibiting the testimony of J.N., Mother's long-time friend, with respect to observing Father in the possession of alcohol while watching the Children in the park sometime in 2010. Mother's Brief at 15-16. In reviewing said claim, we are guided by the following.

When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

-20-

*Phillips v. Lock*, 86 A.3d 906, 920 (Pa. Super. 2014) (internal citation omitted).

The trial court explained that it prohibited the proffered testimony because it was not relevant. Specifically, the trial court found that the proffered testimony "related to a period of time when the parties and the [C]hildren were living together as an intact family." Trial Court Opinion, 4/15/14, at 10. Further, the trial court stated, "Mother testified that she had never known Father to have issues with drugs or alcohol." *Id.* Finally, the trial court recognized that the proffered testimony "would have established that Father *possessed* alcohol while with the [C]hildren, not that he *abused* alcohol, a significantly different consideration." *Id.* (emphasis in original). Upon careful review, we discern no abuse of discretion by the trial court in prohibiting the proffered testimony of J.N. As such, Mother's fifth and final issue fails.

In this case, the trial court thoroughly considered the Section 5328(a) best interest factors, and we are unable to find any abuse of discretion. Thus, we will not disturb the shared legal and physical custody award. Accordingly, we affirm the order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/23/2015



# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | | |
|---|---|---|---|
| C.M.M., | | : | Civil Action – Law |
| | Plaintiff | : | |
| | | : | |
| v. | | : | No. 2011-579 |
| | | : | |
| D.R.M., | | : | In Custody |
| | Defendant | : | Honorable Angela R. Krom, J. |

## OPINION AND ORDER OF COURT

**Before Krom, J.**

IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT
OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | | |
|---|---|---|---|
| C.M.M.[1], | | : | Civil Action – Law |
| | Plaintiff | : | |
| | | : | |
| v. | | : | No. 2011-579 |
| | | : | |
| D.R.M., | | : | In Custody |
| | Defendant | : | Honorable Angela R. Krom, J. |

**OPINION**

Before the Court is the *Petition for Modification of Custody Order* filed by D.R.M.

("Father"), on July 30, 2013. Father's Petition seeks shared physical custody of the parties' three

children. C.M.M. ("Mother") not only objects to Father's request, but also seeks to limit

Father's time with the children and require that his custodial periods be supervised. For the

reasons that follow, the Court must find that it is in the children's best interest to spend more

time in their Father's custody; accordingly, his request for shared physical custody will be

granted.

**FACTS**

Father, currently forty-one years old, resides on Potomac Street in Waynesboro, Franklin

County, with E.D., his twenty-three year old girlfriend of three (3) years. Father and E.D. have

been together since January 2011 when Father and Mother separated. Upon separation, Father

moved in with E.D. and another individual. Since early 2012, Father and E.D. have lived at the

Potomac Street address.

---

[1] The Court believes that it is best practice to redact full names of the parties and the child from the caption and body
of its opinions in custody matters and instead use initials to identify the parties. The Order will retain the parties'
full names.

Father is employed at Village Spirits in Smithsburg, Maryland, a position he has held since May 2013. He works approximately 30 to 36 hours per week either noon to 5:00 p.m. or 5:00 p.m. to close. E.D. works for the Waynesboro Y.M.C.A in their before and after school program at Fairview Elementary School.

Mother, now thirty-eight years old, lives on Fifth Avenue in Waynesboro, Franklin County. She lives with R.K., her twenty-eight year-old boyfriend of three (3) years and the children during her periods of custody. R.K.'s five-year-old daughter, S.K., stays with her father on Sunday's and Monday's. Mother is a senior manager with Outback Steakhouse in Hagerstown, Maryland, and is required to work long hours. She works typically Wednesday, Thursday and Friday from either 1:00 p.m. or 3:00 p.m. until approximately 10:00 p.m. to 1:00 a.m. On Saturday's and Sunday's when the children are in her custody, she starts at 3:00 p.m. and works until 1:00 or 2:00 a.m. On the weekends the children are with their father, Mother starts work at approximately 9:30 a.m. and returns home by 11:00 p.m. R.K. is a manager for Game Stop in the Walkersville, Maryland store. He works 9:00 a.m. to 5:00 p.m. five days each week, Tuesday through Saturday.

The children in this matter are L.L.M., born March 19, 2004; B.M.M., born May 13, 2005; and J.R.M., born July 21, 2006. L.L.M. is in fourth grade at Fairview Elementary School. He is a good student and is involved in the school district's gifted and talented program. He swims on the Waynesboro Y.M.C.A. swim team. B.M.M. is in third grade at Fairview Elementary School, where she is a good student. She also swims on the Waynesboro Y.M.C.A. swim team. J.R.M. is a second grader at Fairview Elementary School. She is also a good student. The children are in good health. None of the children have behavior or attendance issues at school. All three of the children are well-behaved in their parents' homes

2

## . DISCUSSION

The paramount concern in any child custody case is the best interests of the children. To determine what is in the children's best interest, the Court must engage in a case-by-case analysis of all of the factors that may legitimately affect the physical, intellectual, moral, and spiritual well-being of the children. *Durning v. Balent/Kurdilla*, 19A.3d 1125 (Pa. Super. 2011). The legislature has codified the factors that a court must consider in determining what is in the best interest of the children. See 23 Pa. C.S.A. §5328. Each of the applicable factors will be discussed.

### 1. Which party is more likely to encourage and permit frequent and continuing contact between the children and the other party?

Father is the party more likely to encourage and permit frequent and continuing contact between the children and their Mother. This finding is based primarily on Father's willingness to permit Mother to spend time with the children during the periods that the children are not in school and Mother is off work.

Conversely, Mother has been less likely to permit Father to spend time with the children outside of the controlling Order. She has been reluctant to expand Father's periods of physical custody beyond that specified in the August 8, 2013 Order of Court. At the conciliation conference in October 2013, Mother did agree to allow Father to exercise custody one overnight in a two week period – specifically every other Saturday night. Currently, Mother seeks to limit Father's time with the children and requests that Father's time be supervised by an adult other than E.D.

3

**2. The present and past abuse committed by a party or member of the party's household.**

At trial, the Court heard testimony from Mother's teenaged nieces, T.J. and A.J. T.J., now 18 years old, alleged that in the summer of 2010 when she was visiting the family and helping Father and Mother with the children prior to their separation, she and Father engaged in a conversation about sex. During that conversation, Father gave her a vibrator, which she promptly returned. She testified that she did not tell anyone about the incident until recently when her sister, A.J., told her of a similar situation involving Father. T.J. also testified that on one occasion Father gave her alcohol. She elaborated that she and Father were "talking and chilling" in his bedroom watching television. He offered her a wine cooler, which she drank, as well as two or three more. T.J. denied Father's rebuttal allegations that she actually stole the alcohol and consumed it without Father's knowledge while at the parties' home.

A.J., now 16 years old, testified that approximately 4 ½ years ago when she was 11 or 12 years old, she was in the parties' home with Father in his bedroom watching television while Mother was at work. A.J. alleged that Father put his hand up her shirt and touched her breasts. Father then told her he was sorry. She testified that Father often commented on her body, specifically her chest and her "butt". A.J. also related that during the same time frame, Father gave her a vibrator, as well. A.J. told her mother, E.J., of Father's conduct. Although her mother became upset, she ultimately told A.J. that if she "kept it up" she was going to Brook Lane (a mental health facility). Both Mother and her sister, E.J., testified as to confronting Father with A.J.'s allegations at the time she first made them. Both testified that Father denied the allegations. Nothing further came from A.J.'s allegations until Mother resurrected the allegations just prior to trial. In fact, not only was nothing done to follow up on the allegations, but A.J. was also permitted to continue to visit Mother and Father.

4

In rebuttal, Father denied ever hearing the allegations presented by A.J. or T.J. He specifically denied ever being alone in his room with A.J. and denied ever providing a vibrator to either of his nieces. He also denied ever being confronted by his sister-in-law or Mother about A.J.'s allegations. He further accused T.J. of stealing alcohol on one occasion when she was spending the weekend at his and Mother's home.

Father argued that it was not until after the October 4, 2013 Conciliation Conference that Mother chose to raise the above allegations, having failed to do so in her Complaint for Custody filed February 11, 2011, and her Conciliation Memorandum of September 9, 2013. In fact, the first time this issue is raised by Mother in official Court filings is in Mother's December 2, 2013 Pre-Trial Conference Memorandum. Notably, it was Father who requested this matter move forward to trial.

In response, Mother argues that she learned of additional reports of inappropriate activity by Father from her nieces after the October 2013 Conciliation Conference. She also received an erroneously sent text message from Father that reminded her of the incident with A.J., so she inquired again of A.J. and learned about the incidents described above. Mother argues that she views Father's relationship with E.D. as continued inappropriate conduct and evidence of his propensity to surround himself with significantly younger females.

To be clear, none of the children have made allegations that their father has engaged in inappropriate behavior of a sexual or immoral nature with them. Although Mother introduced evidence of and Father and E.D. admitted to having the children eat their messy dinners (i.e. spaghetti) without their shirts, the Court is not convinced that such behavior is harmful to the children. While there may be more desirable ways to keep the children's clothing clean while eating their potentially messy meals (and the Court would strenuously encourage Father to find

5

one), this activity, alone, do not alarm this Court to such a degree to warrant limiting Father's time with the children.

As to the allegations of A.J. and T.J., the Court is left to wonder why allegations of such immoral and inappropriate behavior are only now coming to light when clearly, at a minimum, the allegations of A.J. were known to Mother and E.J. years ago. Unfortunately, the timing of Mother's allegations causes the Court concern.

**3. The parental duties performed by each party on behalf of the children.**

In analyzing this factor, the Court must consider which parent meets the physical, emotional and social needs of the children. There is no evidence to suggest that either parent is not meeting the children's basic daily needs for food, clothing and shelter. Both parents perform parental duties on behalf of the children when they are in their care. There is no evidence to suggest that either party's home is not physically appropriate for the children.

Both parties have participated in the children's extracurricular activities. Both Mother and Father take L.L.M. and B.M.M. to swim team practice and are available to attend their swim meets when their work schedules permit. Father and E.D. are involved in the P.T.O. in the children's school.

**4. The need for stability and continuity in the children's education, family life and community life.**

Generally, children thrive in environments that provide stability and continuity in their education, family life and community life. Despite relative instability in their family life, these children appear to be doing quite well. All three are good students who exhibit no behavioral or

6

attendance issues. All three are well-behaved and well-mannered. The two older children enjoy participating in the swim team, and J.R.M. is eager to follow in her siblings' footsteps.

Unfortunately, Mother's long work hours do create some instability for the children. They are shuffled from caregiver-to-caregiver during Mother's periods of custody. This shuffling is of concern to Father, who would be available to provide care for the children, and is also of concern to the children. The Court cannot fault Mother for working to support her family or for needing the assistance of caregivers; however, the children do feel her absence.

### 5. Availability of extended family.

Mother's extended family lives in the Hagerstown, Maryland, area. The children often spend time with their cousins and Mother's other extended family, especially when Mother is working. (See Factor 4, above). Maternal grandmother lives in Waynesboro.

Father's mother lives in Leesburg, Virginia. The children see their paternal grandmother approximately once every three (3) months. She does speak regularly with Father and the children on the telephone.

E.D.'s family lives in Waynesboro; however, E.D. and her family do not speak because of their disapproval of her relationship with Father.

### 6. The children's sibling relationships.

The children are not only very close in age but are also very closely bonded to one another. L.L.M. seems to be the big brother who feels it is his responsibility to look out for his younger sisters. Certainly typical sibling squabbles occur, but generally the children get along well. The children also appear to be close to R.J.'s daughter, S.K. J.R.M. spoke enthusiastically of the fun she and S.K. have playing together.

7

7. **The well-reasoned preferences of the children, based on the children's maturity and judgment.**

The Court interviewed each child *in camera*. Each child was polite, articulate, friendly and a pleasure to interview. Each child did his or her best to answer the Court's questions truthfully, honestly, and openly. It was clear to the Court that all three children love each of their parents and enjoy the opportunities they have to spend with each parent. The children enjoy their time with R.K. and seem to have genuine affection for him – which seems to be mutual. The children are also quite fond of E.D. and very much enjoy her company. E.D. expressed her affection for and commitment to the children, as well.

It was also clear to the Court that each child would welcome the opportunity to spend more overnights with their father, especially on those occasions when they would be in the care of a sitter because of Mother's work demands. The children's preferences will be considered, as they were well-reasoned and the product of sufficient maturity and judgment.

8. **The attempts of a parent to turn the child against the other parent.**

There is insufficient evidence in the record for the Court to find that either parent has specifically attempted to turn the children against the other parent. Both acknowledge the children's love and affection for the other parent. Further, despite Mother's allegations of Father's inappropriate activity with A.J. and T.J., as discussed in Factor 2, above, to her credit, it does not appear that the children have any knowledge of the allegations – which is as it should be. Therefore, the Court cannot find that Mother's efforts have been aimed to at turning the children against their Father.

8

**9. Which parent is more likely to maintain a loving, stable, consistent and nurturing relationship with the children adequate for the children's emotional needs?**

The parties are equally likely to maintain loving and nurturing relationships with the children adequate for their emotional needs. The children view both parents as sources of love and support.

**10. Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the children?**

Neither parent is more likely than the other to attend to the children's daily physical, emotional, developmental, educational, and special needs. During the time that the children are in each parent's custody, each parent, with the assistance of their significant other, has adequately attended to the children's daily needs.

**11. The proximity of the residences of the parties.**

These children are fortunate in that Mother and Father live within walking distance of each other in the Borough of Waynesboro. The children's school, Fairview Elementary, is between the two homes. The parties do, and should continue to use the proximity of their residences as an advantage to their children.

**12. Each party's availability to care for the children or make appropriate child care arrangements.**

Each party has been able to make appropriate child care arrangements for the children during the periods of time that they must work. Father is regularly assisted by E.D. in caring for the children when he is working. In fact, E.D. is employed by the Y.M.C.A.'s before and after

school program in the children's elementary school. This constant, daily interaction with the children is a positive thing for them.

Mother also makes adequate and appropriate arrangements for care for the children with various relatives including her nieces and her significant other when she is at work. While the quality of the care provided for the children is not at issue, the amount of the time children spend with alternate caregivers is a concern – primarily because the children seem to truly feel her absence.

**13. The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.**

According to Father, until recently the parties were able to communicate rather well. More recently communication has been strained because Father is furious with Mother over the allegations involving A.J. and T.J. (See Factor 2, above). Mother testified that she tries to keep Father informed regarding the children, but since the Pre-Trial Conference in December, 2013, communication has been only as necessary.

**14. The history of drug and alcohol abuse of a party or member of a party's household.**

The Court heard no credible evidence of either party's current abuse of drugs or alcohol. Although she testified that she does not know Father to have issues with drugs or alcohol, Mother attempted to present a witness to Father's past alcohol consumption. Based on the timeline provided by the witness, the Court found the allegations to be so dated as to be irrelevant.

**15. The mental and physical condition of a party or a member of a party's household.**

The Court heard no evidence of any mental or physical condition of a party or member of the party's household that would impair the party's ability to care for the children.

## CONCLUSION

After analysis and discussion of the 23 Pa.C.S.A. §5328(a) factors, the Court finds that Father's request to spend additional time with the children should and will be granted. Both parents are equally capable of meeting their children's physical, emotional, educational, and social needs. The parties live within walking distance of one another. The children see both parents as sources of love and support. Both parents are active in these children's lives. It is in the children's best interests to spend equal time in each parent's custody.

While the Court certainly cannot ignore the allegations of A.J. and T.J., the Court is very concerned that no adult felt it appropriate to raise the allegations of Father's alleged inappropriate behavior prior to the December 2013 Pre-Trial Conference Memorandum. Many opportunities to address the allegations, discover the truth, and respond accordingly were missed. Neither law enforcement nor child protective services were given the opportunity to conduct a proper investigation into A.J.'s allegations. Only after Father requested additional time with the children by moving this case to pre-trial conference did Mother engage in the investigation reported to the Court at trial. In addition, there is no evidence that the children at issue have ever been subjected to inappropriate touching or other inappropriate conduct by Father.[2]

---

[2] The Court refuses to find that having the children eat messy spaghetti dinners without their shirts, without more, is inappropriate conduct. However, as the children age and become more aware of their developing bodies, Father is again, strenuously encouraged to find another way to resolve this issue.

11

The state of the record leaves the Court with far more questions than answers. When balanced with the other credible evidence in the case, the Court is constrained to find that A.J.'s and T.J.'s allegations, without more, are insufficient to warrant either reducing Father's time with the children or requiring that his time be supervised.

Mother's position with Outback Steakhouse demands that she work long hours during both the daytime and the evening. Mother is to be commended for her strong work ethic and for her desire to provide for the children during periods when Father has not held steady employment. However, when Mother is at work, the children are often in the care of sitters other than R.J. Rather than spend their time in the care of a sitter (even if the sitter is a competent, capable family member), there is no reason that the children should not be with their father. An Order that maximizes each party's time with the children based on their work schedules must result.

12

PROTHONOTARY
FRANKLIN COUNTY PA

2014 FEB 28 PM 2: 05

LINDA L. BEARD
PROTHONOTARY

DEPUTY JM

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| Christina M. Miller, | : | Civil Action – Law |
| Plaintiff | : | |
| | : | |
| v. | : | No. 2011-579 |
| | : | |
| David R. Miller, | : | In Custody |
| Defendant | : | Honorable Angela R. Krom, J. |

## ORDER OF COURT

AND NOW, this 28th day of February, 2014, the Court having held a trial on February 17, 2014 and for the reasons set forth in the foregoing Opinion, enters the following Order:

IT IS HEREBY ORDERED THAT:

1.      Plaintiff, hereinafter referred to as "Mother", and Defendant, hereinafter, referred to as "Father", shall have shared legal custody of their children, Logan L. Miller, born March 19, 2004, age 9, Bailey M. Miller, born May 13, 2005, age 8, and Jordan R. Miller, born July 21, 2006, age 7.

2.      Mother and Father shall have shared physical custody of the children as follows:

A.      Mother shall have the children every Monday at 9:00 a.m. through Wednesday at 9:00 a.m.; and every other weekend from Friday at 9:00 a.m. through Monday at 9:00 a.m.

B.    Father shall have the children every Wednesday at 9:00 a.m. through Friday at 9:00 a.m.; and every other weekend from Friday at 9:00 a.m. through Monday at 9:00 a.m.

C.    At such other times as the parties agree.

3.    The parties shall share custody of the children over the holidays as per the following schedule. Holiday custody shall take precedence over the custody schedule set forth in Paragraph 2 above.

A.    For Thanksgiving, commencing in 2014 and even numbered years thereafter, Mother shall have the children from the Wednesday before Thanksgiving at 3:00 p.m. through Thanksgiving Day at 3:00 p.m. and Father shall have the children from Thanksgiving Day at 3:00 p.m. through the immediately following Friday at 3:00 p.m. In 2015 and in odd numbered years thereafter, the schedule shall be reversed.

B.    For Christmas, commencing in 2014 and even numbered years thereafter, Father shall have the children from December 24th at 3:00 p.m. through December 25th at 3:00 p.m. and Mother shall have the children from December 25th at 3:00 p.m. through December 26th at 3:00 p.m. In 2015 and in odd numbered years thereafter, the schedule shall be reversed.

C.    For Easter, commencing in 2014 and even numbered years thereafter, Father shall have the children from Easter morning at 9:00 a.m. until 2:00 p.m. and Mother shall have the children from 2:00 p.m. until 7:00 p.m. In 2015 and in odd numbered years thereafter, the schedule shall be reversed.

D.      Each year Mother shall have the children for Mother's Day and Father shall have the children for Father's Day from 9:00 a.m. through 7:00 p.m. the day of the holiday.

4.      Each summer, each party shall have the right to have the children for two (2) non-consecutive seven day periods.  Each party shall give the other written notice of the weeks they would like to have the children by June 1 each year.  In the event of conflict, in 2014 and in even numbered years thereafter, Father's choices shall take precedence, in 2015 and in odd numbered years thereafter, Mother's choices shall take precedence.

5.      Should either party need childcare for a period in excess of six (6) hours, he or she will contact the other parent to provide the care before making arrangements with a third party.  Only if the other parent is unavailable to provide the care needed will third parties be used.

6.      Neither party will disparage, ridicule, or in any other way cause the children to question the other party's love for the children or parental authority while the children are in her/his care.  Further, neither party shall allow any third party while in the presence of any of the children to engage in any conduct to insult or ridicule the other party or engage in other conduct that would cause the children to question the other's parental authority or love for any of the children.

7.      Neither party may make a change in residence of the children which significantly impairs the ability of a non-relocating party to exercise custodial rights without first complying with all of the applicable provisions of 23 Pa. C.S. 5337.

8.     Pursuant to the requirements of *Pa.R.C.P. 236(a)(2), (b), (d),* the Prothonotary shall give written notice of the entry of this Order, including a copy of this Order to each parties' attorney of record and shall note in the docket the giving of such notice and the time and manner thereof.

By the Court,

_____ J.

*The Prothonotary shall give notice to:*
✓Stephen D. Kulla, Esquire
✓Jeffrey S. Evans, Esquire